IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| CONSTANTINOS KAPERNEKAS, ) | |
| ) | |
| Plaintiff, ) | |
| ) | No. 17 C 6040 |
| v. ) | |
| ) | Magistrate Judge Sidney I. Schenkier |
| VILLAGE OF STONE PARK, a ) | |
| municipal corporation; OFFICER ALBI ) | |
| NUMANAJ, # 31; and OFFICER ) | |
| JOSEPH KELLEY, # 13, ) | |
| ) | |
| Defendants. ) | |

## MEMORANDUM OPINION AND ORDER[1]

Plaintiff, Constantinos Kapernekas, has sued defendants Village of Stone Park ("Stone Park" or the "Village") and Stone Park police officers, Albi Numanaj and Joseph Kelley (collectively, "defendants"), alleging they used excessive force in violation of the Fourth Amendment and committed willful and wanton misconduct, battery and intentional infliction of emotional distress in violation of state law (doc. # 1: Compl., ¶¶ 23-24).[2] Defendants have asserted various affirmative defenses to plaintiff's claims, including qualified immunity (doc. # 16: Answer at 7). Following discovery, defendants filed a motion for summary judgment (doc. # 40). The motion is now fully briefed.[3] For the reasons set forth below, the Court grants defendants' motion.

---

[1]On January 12, 2018, by consent of the parties and pursuant to 28 U.S.C. § 636(c) and Local Rule 73.1, this case was assigned to this Court for all proceedings, including entry of final judgment (doc. # 23).

[2]Mr. Kapernekas alleges that the Village is liable for any state law (but not federal law) claims under a theory of *respondeat superior* (Compl., at ¶ 23). He has not asserted a *Monell* claim against the Village (doc. # 25).

[3]As a preliminary matter, we find plaintiff's argument that defendants' summary judgment motion should be stricken as untimely to be without merit (doc. # 57: Pl.'s Resp. at 3-4). As plaintiff points out, defendants filed the exhibits to their summary judgment motion on January 16, 2019, although the summary judgment motion was filed on its due date of December 28, 2018 (*Id.*). However, plaintiff ignores the fact that defendants filed their exhibits together with a motion for extension of time (doc. # 42), which the Court granted (doc. # 55).

# I.

In support of their motion for summary judgment, defendants submitted a statement of material facts (doc. # 40, pp. 2-5: DSOF). Plaintiff responded to defendants' statement of material facts (doc. # 58, pp. 1-8: Pl.'s Resp. to DSOF) and filed a Rule 56.1(b)(3)(C) statement of additional facts (doc. # 58, pp. 9-11: PSOF).[4] Defendants have not responded to plaintiff's statement of additional facts. The following facts are undisputed unless otherwise indicated.

Mr. Kapernekas owns an apartment building with three units at 1723 North Mannheim Road in Stone Park, Illinois; he sometimes resides in one of those units (DSOF, Ex. A: Kapernekas Dep. at 7:20-8:20). Mr. Kapernekas was 85-years old when, on August 28, 2016, at approximately 11:00 a.m., he arrived home after grocery shopping and saw Tracy Plessner sitting on his property, drinking beer and listening to his radio (Pl.'s Resp. to DSOF, ¶ 1). Mr. Kapernekas estimates that the temperature that day was 83 degrees (Compl., ¶ 5). He was familiar with Ms. Plessner because she was friends with one of his tenants, and he would sometimes see them outside on the patio (Kapernekas Dep. at 26:4-28:22). When he saw her on August 28, 2016, Mr. Kapernekas told her to move from where she was sitting, which was in an empty lot next to his apartment building (*Id.* at 34:23-36:15). Mr. Kapernekas and Ms. Plessner had a "disagreement" which led to a "physical altercation" (Pl.'s Resp. to DSOF, ¶ 2).

At 11:23 a.m., Ms. Plessner called 911 (Pl.'s Resp. to DSOF, ¶ 12). The emergency call record states that Ms. Plessner was "hysterical" and reported getting slapped in the face by a white male (Defs.' Mot., Ex. C). Officer Kelley and his partner, Officer Numanaj, were at the Village police station when they received a call on their radios dispatching them to 1723 North Mannheim

---

[4]Neither party's filings conform with the requirements of Local Rule 56.1. Defendants filed their DSOF in the same document as their motion for summary judgment (doc. # 40), and plaintiff included his PSOF in the same document as his response to defendants' statement of facts. As neither party complains of the other's local rule violations, we use our discretion to disregard those violations and proceed to the merits of defendants' motion.

2

Road (Defs.' Mot., Ex. G: Kelley Dep. at 8:3-9:1). They took separate squad cars to the location, which is 1.5 blocks from the station, or about a one to two-minute drive (*Id.* at 11:14-21; Defs.' Mot., Ex. H: Numanaj Dep. at 6:7-7:3).

Officers Kelley and Numanaj both arrived at the scene at approximately 11:40 a.m. (Pl.'s Resp. to DSOF, ¶ 4). Officer Numanaj had not encountered Mr. Kapernekas before that date (Numanaj Dep. at 5:1-3). When the officers arrived at the scene, Ms. Plessner was crying and Mr. Kapernekas was screaming loudly (Defs.' Mot., Ex. B: Arrest Record).[5] Mr. Kapernekas was holding an approximately three-foot long wooden stick; the arrest record states that Mr. Kapernekas was threatening to strike Ms. Plessner with the stick, but Mr. Kapernekas testified that he was hitting garbage cans with the stick to scare Ms. Plessner away (*Id.*; Kapernekas Dep. at 52:2-20, 61:16-20) (That discrepancy is immaterial to our ruling). Mr. Kapernekas let go of the stick on Officer Kelley's orders (Arrest Record). Officer Kelley testified that Mr. Kapernekas had appeared to him to be "an older gentleman" in his seventies (Kelley Dep. at 15:6-15). Plaintiff has offered no evidence that the defendant officers knew he was 85-years old, or was in any way frail.

The officers testified -- without contradiction -- that Mr. Kapernekas continued screaming and yelling (Defs.' Mot., Ex. G: Kelley Dep. at 12:9-14:9; Defs.' Mot., Ex. H: Numanaj Dep. at 7:18-10:5).[6] "A few minutes" after they arrived at 11:40 a.m., Officer Numanaj handcuffed Mr. Kapernekas, then left Mr. Kapernekas with Officer Kelley while he drove his squad car -- which

---

[5]Plaintiff notes that he did not testify one way or another that he was screaming (Pl.'s Resp. to DSOF, ¶ 18). However, Mr. Kapernekas did not offer any evidence that he was not screaming. The fact that he did not confirm the officers' testimony and the police reports documenting him yelling and screaming does not create a genuine issue of fact as to whether he was yelling and screaming, especially given his failure to deny that assertion during his deposition. *See Daugherty v. Page*, 906 F.3d 696, 611-12 (7th Cir. 2018) (plaintiff must identify evidence to create a genuine dispute of fact; "mere speculation" does not suffice to create a dispute). *See also Dawson v. Brown*, 803 F.3d 829, 834-35 (7th Cir. 2015) ("Although we must view the evidence in the light most favorable to [the plaintiff], he is only entitled to reasonable inferences from the facts presented, not those only supported by speculation or conjecture").

[6]*See supra* n.5.

was parked at the front of the building -- around to a nearby alley that would give him a visual of the car (Kelley Dep. at 13:17-14:13; Numanaj Dep. at 7:22--9:7).

Officer Numanaj then locked Mr. Kapernekas in the back seat of his squad car and joined Officer Kelley in speaking with Ms. Plessner and two witnesses, Frank Moya and Bernadet Saubert (Pl.'s Resp. to DSOF, ¶¶ 6, 20; Kapernekas Dep. at 64:8-17, 67:19-68:24; Arrest Record). Mr. Kapernekas estimates he was locked in the police car at 11:50 a.m. (Pl.'s Resp. to DSOF, ¶ 6). Police records state that Mr. Moya and Ms. Saubert observed Mr. Kapernekas striking Ms. Plessner with his hand, and the officers noted Ms. Plessner had a swollen eye and lump on her temple (Arrest Record). Ms. Plessner refused medical attention but insisted on pressing charges (*Id.*).

When he was placed in the squad car, Mr. Kapernekas was so upset that if he "had a hand grenade, [he] would pull the trigger" (Kapernekas Dep. at 74: 21-22). In the car, he struggled unsuccessfully to open the doors and break the windows (Pl.'s Resp. to DSOF, ¶ 7). Mr. Kapernekas testified he was hot and sweating in the car; he felt like he was dying and he passed out (Kapernekas Dep. at 74:15-75:22). Officer Numanaj testified that the driver's side window in his squad car was open and the air conditioning was running; leaving a window open and the air conditioning on was his routine practice when he was near his parked car (Numanaj Dep. at 10:9-23; 17:5-12).[7]

After the witnesses left, the officers returned to the squad car and found Mr. Kapernekas had defecated in his pants (Pl.'s Resp. to DSOF, ¶¶ 21-22). The officers let him out of the car, uncuffed him, and told him to go inside the house to take a shower (*Id.*, ¶ 10). Mr. Kapernekas

---

[7]Plaintiff purports to dispute Officer Numanaj's testimony (Pl.'s Resp. to DSOF, ¶ 24). However, at his deposition, Mr. Kapernekas did not testify whether the air conditioning was on or a window was open in the squad car (Kapernekas Dep. at 74:15-75:15). Because plaintiff fails to identify evidence that disputes Officer Numanaj's testimony, he has not created a genuine dispute of fact on this issue. *See Daugherty*, 906 F.3d at 611-12; *Dawson*, 803 F.3d at 834-35.

went into his house, took his pants and underwear off, showered from his bellybutton down, and then put on shorts and slippers (Kapernekas Dep. at 78:1-15). The officers waited outside while Mr. Kapernekas cleaned up and put away his groceries (*Id.*, ¶ 22).

At 12:02 p.m., the officers arrived with Mr. Kapernekas at the police station (Pl.'s Resp. to DSOF, ¶ 14). Mr. Kapernekas was booked for committing a battery under 720 ILCS 5/12-3(a)(1) for striking Ms. Plessner in her face and pulling her hair (Arrest Record). At 12:50 p.m., Mr. Kapernekas was issued an I-Bond and released from custody (Pl.'s Resp. to DSOF, ¶ 17). He did not visit a doctor until a week later (*Id.*, ¶ 11). The misdemeanor charge was later dismissed (Answer, ¶ 6).

Mr. Kapernekas alleges that defendants' actions in keeping him locked and handcuffed in Officer Numanaj's squad car violated the Fourth Amendment and state law. He does not contest the propriety of his arrest or prosecution.[8] Defendants contend that they are entitled to summary judgment because both defendant officers are entitled to qualified immunity.

## II.

Summary judgment is appropriate where the moving party establishes that there is no genuine issue as to any material fact and he or she is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). A genuine issue exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In deciding a motion for summary judgment, we construe the facts and draw reasonable inferences in the light most favorable to the nonmoving party. *Sommerfield v. City of Chicago*, 863 F.3d 645, 649 (7th Cir. 2017). "[T]he non-movant must go beyond the pleadings . . . to demonstrate that there is evidence upon which a jury

---

[8] At Mr. Kapernekas's deposition, his lawyer confirmed that he was not bringing a malicious prosecution or wrongful arrest claim (Kapernekas Dep. at 34:17-21).

could properly proceed to find a verdict in her favor.'" *Sterk v. Redbox Automated Retail, LLC*, 770 F.3d 618, 627 (7th Cir. 2014) (internal quotations and citations omitted).

"The doctrine of qualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Sinn v. Lemmon*, 911 F.3d 412, 418 (7th Cir. 2018) (quoting *Pearson v. Callahan*, 555 U.S. 223, 231 (2009)). The doctrine "provides ample room for mistaken judgments and protects all but the plainly incompetent and those who knowingly violate the law." *Reed v. Palmer*, 906 F.3d 540, 546 (7th Cir. 2018) (internal citations and quotations omitted). "Qualified immunity is an affirmative defense, and once raised, the plaintiff bears the burden of defeating it by showing: (1) the defendant violated a constitutional right, and (2) that right was clearly established at the time of the alleged violation." *Sinn*, 911 F.3d at 418. "A failure to show either is fatal for the plaintiff's case." *Id.* (quoting *Archer v. Chisholm*, 870 F.3d 603, 613 (7th Cir. 2017)). Mr. Kapernekas has not met his burden here.

Under the first prong of the qualified immunity test, Mr. Kapernekas must show that the defendant officers' actions violated the Fourth Amendment. "The crucial question" under the Fourth Amendment is "whether the official acted reasonably in the particular circumstances that he or she faced." *Reed*, 906 F.3d at 546 (internal quotations and citations omitted). "Whether a particular use of force was objectively reasonable is a legal determination rather than a pure question of fact for the jury to decide." *Dockery v. Blackburn*, 911 F.3d 458, 464 (7th Cir. 2018).

Mr. Kapernekas contends that because he was 85-years old, the officers' actions in handcuffing him and locking him in the back of a hot squad car were objectively unreasonable (doc. # 57: Pl.'s Resp. at 4-5). "[T]he Fourth Amendment's 'reasonableness' standard [] turns on the totality of the circumstances confronting [the officers] viewed from the perspective 'of a

6

reasonable officer on the scene, rather than with the 20/20 vision of hindsight.'" *Dockery*, 911 F.3d at 464 (quoting *Graham v. Connor*, 490 U.S. 386, 396-97 (1989)).

> [W]hether an officer knows that a given action unnecessarily will harm a particular individual will depend upon the circumstances of the arrest. In some cases, the fact that an act will cause pain or injury will be clear from the nature of the act itself. In other cases, it may become clear to an arresting officer that, although a particular action would not ordinarily harm an arrestee, the action would nevertheless cause pain or injury to the particular individual being placed under arrest.

*Stainback v. Dixon*, 569 F.3d 767, 772 (7th Cir. 2009). "[A] reasonable officer cannot be expected to accommodate an injury that is not apparent or that otherwise has not been made known to him." *Id.* at 773.

### A.

*First*, we conclude that a jury could not reasonably find that the defendant officers' actions in this case were of a nature that would ordinarily harm an arrestee. Drawing all reasonable inferences in the light most favorable to Mr. Kapernekas, he could not have been handcuffed in the squad car for more than 15 minutes. The officers arrived at the scene at approximately 11:40 a.m. Mr. Kapernekas estimates that he was locked in the police car at 11:50 a.m., but the officers believe it only took a few minutes before Mr. Kapernekas was handcuffed and then another minute for Officer Numanaj to pull his car around and put Mr. Kapernekas inside. Thus, Mr. Kapernekas may have been locked in the squad car as early as 11:44 a.m. Between that time and 12:02 p.m., when Mr. Kapernekas and the officers arrived at the police station, Mr. Kapernekas showered from the waist-down, changed his pants and underwear, and unloaded his groceries. Even if it took as little as 30 to 60 seconds each for Mr. Kapernekas to remove his soiled clothes, shower, dress, unload his groceries, go back and forth to his apartment, and ride to the police station, that only leaves between 12 and 15 minutes that Mr. Kapernekas could have been handcuffed in the squad car. Being handcuffed in a police car for such a short amount would not ordinarily harm an arrestee.

7

The only case Mr. Kapernekas cites to support his argument that the nature of the officers' actions violated the Fourth Amendment, *Sims v. Olszewski*, No. 17 C 79, 2017 WL 1903121 (N.D. Ill. May 9, 2017), is both procedurally and factually inapposite. In *Sims*, the district court denied a Rule 12(b)(6) motion to dismiss where the plaintiff alleged that he was not wearing undergarments or proper clothing when the defendant officers forced him to walk 200 feet through slushy ice water, sit in an unheated police car despite his crying and pleading for heat, and spend the rest of the day and night in a cold cell. *Id.* at *1-2. Here, by contrast, Mr. Kapernekas faces a heavier burden opposing defendants' claim of qualified immunity on summary judgment, and the evidence he has presented is much less compelling: he was locked in the squad car, with a window open and air conditioning on, for less than 15 minutes. Although plaintiff contends that he "subjectively experienced his period in the car as being close to an hour and twenty-five minutes" (Pl.'s Resp. at 4), his subjective experience does not provide the necessary basis for a Fourth Amendment claim. Rather, as explained above, the Fourth Amendment asks whether the officers acted reasonably given what they knew at the time they put Mr. Kapernekas in the squad car.[9]

## B.

*Second*, we find that Mr. Kapernekas's age at the time of the incident did not make the officers' otherwise reasonable actions unreasonable. As explained above, "it may become clear to

---

[9] Furthermore, even if Mr. Kapernekas was in the squad car with no air conditioning or open window, courts have consistently held that detaining a person for such a short time in a hot squad car is not unreasonable under the Fourth Amendment. *See, e.g., Turner v. Lieutenant Driver*, 848 F.3d 678, 683-84 (5th Cir. 2017) (officers who placed a handcuffed plaintiff in the back of their patrol car and left him there "to sweat for a while with the windows rolled up" were entitled to qualified immunity on the plaintiff's Fourth Amendment claim); *Anderson v. City of Naples*, 501 F. App'x 910, 914-15 (11th Cir. 2012) (officer's decision to leave the plaintiff in a patrol car for 17 minutes was reasonable even though it was 81 degrees outside and the plaintiff was wearing a gorilla suit); *Moreno v. Turner*, 572 F. App'x 852, 858 (11th Cir. 2014) (plaintiff who was handcuffed and held in the back of a hot patrol car for 30 minutes without air conditioning did not state a plausible claim that his Fourth Amendment rights were violated); *Chagolla v. City of Chicago*, No. 07 C 4557, 2012 WL 403920, at *3 (N.D. Ill. Feb. 8, 2012) (detaining a handcuffed suspect for 15 to 20 minutes in a hot police car was not unreasonable and did not constitute excessive force despite the discomfort the suspect experienced).

an arresting officer that, although a particular action would not ordinarily harm an arrestee, the action would nevertheless cause pain or injury to the particular individual being placed under arrest." *Stainback*, 569 F.3d at 772. However, to determine what was clear to the officers, "we must focus on what [they] knew at the time of the incident." *Howell v. Smith*, 853 F.3d 892, 899 (7th Cir. 2017).

Here, Officers Kelley and Numanaj responded to a 911 call about a possible domestic violence incident. When they arrived at the scene, Ms. Plessner had bruises on her face and was crying, and Mr. Kapernekas was brandishing a three-foot long wooden stick and screaming and yelling. When Mr. Kapernekas would not stop screaming, the officers reasonably decided to detain him in the squad car while they interviewed witnesses. The officers did not know Mr. Kapernekas was 85-years old, and there was nothing frail about the way he was behaving that would give them a reason to think he suffered from any infirmities. Mr. Kapernekas does not allege that he gave the officers any information about his age or a health condition that would have put them on notice that the handcuffs or his brief detention in the squad car would harm him. Nor does Mr. Kapernekas contend that he had pre-existing health problems; to the contrary, he contends that he injured his hands and wrists and developed heart problems during the short time he was in the squad car (Kapernekas Dep. at 82:23-85:3, 87:18-88:4).

The Seventh Circuit has affirmed summary judgment in cases presenting analogous facts. For example, in *Stainback*, the plaintiff alleged that the defendant officers used excessive force while arresting him by keeping him in handcuffs for 15 to 20 minutes, which ultimately caused him to suffer two torn rotator cuffs. *Stainback*, 569 F.3d at 769. The Seventh Circuit disagreed, holding that the officers' actions were reasonable under the circumstances and that no violation of the Fourth Amendment occurred because: (1) the officers did not use the handcuffs "in a manner

9

that would clearly injure or harm a typical arrestee;" (2) "it was not objectively clear to the [o]fficers that [the plaintiff] suffered from any infirmities;" and (3) the plaintiff did not "inform the [o]fficers that he had a preexisting injury or condition that would be aggravated if he were handcuffed." *Id. See also Howell*, 853 F.3d at 899-900 (holding that officer's use of handcuffs to restrain the plaintiff for about 30 minutes did not violate the Fourth Amendment, even though it aggravated a pre-existing shoulder condition, because the plaintiff never told the officer of his pre-existing condition or complained of pain); *Tibbs v. City of Chicago*, 469 F.3d 661, 666 (7th Cir. 2006) (holding that officer did not violate the plaintiff's Fourth Amendment rights where the plaintiff was in handcuffs for 25 to 30 minutes and had complained that his handcuffs were too tight, but he did not elaborate on the degree of his pain or seek medical care for a wrist injury).

Like the above cases, plaintiff has not met his burden of showing that the defendant officers violated the Fourth Amendment, because the undisputed facts show that their actions were objectively reasonable under the circumstances; they were not of a nature that would ordinarily harm an arrestee, and it was not objectively clear to the officers that Mr. Kapernekas might suffer from a brief detention in handcuffs in the squad car. Because Mr. Kapernekas has not shown that defendants violated a constitutional right, Officers Numanaj and Kelley are entitled to qualified immunity on his Fourth Amendment claim.[10]

---

[10]Although Mr. Kapernekas's failure to establish the first prong of the qualified immunity test is fatal to his Fourth Amendment claim, we further note that he has also not met his burden to show that he had a "clearly established" right not to be handcuffed and locked in a hot police car for even a brief period of time given his advanced age (*see* Pl.'s Resp. at 5). "Ordinarily, to show that the law was clearly established, plaintiffs must point to a closely analogous case finding the alleged violation unlawful. They need not point to an identical case, but existing precedent must have placed the statutory or constitutional question beyond debate." *Reed*, 906 F.3d at 547-48 (internal citations and quotations omitted). Here, Mr. Kapenekas does not point to any case to support his contention that based on his age, he had a clearly established right not to be handcuffed and detained in a hot police car. Nor have the Court's searches turned up a case applying the Fourth Amendment's objectively reasonable standard differently based solely on a plaintiff's age. By contrast, the Court has found cases supporting that detention of a suspect in a hot police car for a short period of time does not violate a clearly established right. *See supra* n.9.

## III.

Having disposed of Mr. Kapernekas's federal claims, we are left only with his supplemental state law claims of willful and wanton misconduct, battery and intentional infliction of emotional distress. "Generally, when a court has dismissed all the federal claims in a lawsuit before trial, it should relinquish jurisdiction over supplemental state law claims rather than resolve them on the merits." *Cortezano v. Salin Bank & Tr. Co.*, 680 F.3d 936, 941 (7th Cir. 2012). The Seventh Circuit has set forth three exceptions to this presumption: "(1) the statute of limitations has run on the pendent claim, precluding the filing of a separate suit in state court; (2) substantial judicial resources have already been committed, so that sending the case to another court will cause a substantial duplication of effort; or (3) when it is absolutely clear how the pendent claims can be decided." *RWJ Mgmt. Co. v. BP Prod. N. Am., Inc.*, 672 F.3d 476, 480 (7th Cir. 2012) (quoting *Sharp Elecs. Corp. v. Metro. Life Ins. Co.*, 578 F.3d 505, 514-15 (7th Cir. 2009)). The decision whether to exercise supplemental jurisdiction over state law claims when all the federal claims have been dismissed is entrusted to the district court's discretion. *RWJ*, 672 F.3d at 479.

Here, the correct resolution of Mr. Kapernekas's state law claims is absolutely clear. As defendants point out, the Illinois Local Government and Governmental Employees Tort Immunity Act provides that "a public employee is not liable for his act or omission in the execution or enforcement of any law unless such act or omission constitutes willful and wanton conduct" (Defs.' Mot. at 11-12, quoting 745 ILCS 10/2-202). The Tort Immunity Act defines "willful and wanton conduct" as "a course of action which shows an actual or deliberate intention to cause harm or which, if not intentional, shows an utter indifference to or conscious disregard for the safety of others or their property." 745 ILCS 10/1-210.

The Seventh Circuit and courts in this district agree that where an Illinois public employee's actions are found to be "objectively reasonable" under the Fourth Amendment, those actions cannot be considered willful and wanton, and they will be entitled to immunity under the Tort Immunity Act. *See Horton v. Pobjecky*, 883 F.3d 941, 954 (7th Cir. 2018) (affirming district court's determination that the defendants were entitled to immunity on the plaintiff's state law claims because the defendants' actions were objectively reasonable, and thus "they cannot be willful and wanton"). Courts in this district have applied this rule to dismiss Illinois battery and intentional infliction of emotional distress claims, such as those raised by Mr. Kapernekas. *See Gill v. Vill. of Melrose Park*, 35 F. Supp. 3d 956, 967-68 (N.D. Ill. 2014) (dismissing state law battery claim); *Rebolar ex rel. Rebolar v. City of Chicago, Ill.*, 897 F. Supp. 2d 723, 741-42 (N.D. Ill. 2012) (dismissing state law battery claim); *Morris v. Smith*, No. 14 C 8076, 2016 WL 3671428, at *2 (N.D. Ill. July 11, 2016) (dismissing state law intentional infliction of emotional distress claim); *Smith v. Vill. of Norridge*, No. 06 C 4250, 2009 WL 210458, at *12-14 (N.D. Ill. Jan. 22, 2009) (dismissing state law claims for battery and intentional infliction of emotional distress).

Under this well-settled law, because the Court concludes that the actions of Officers Numanaj and Kelley were objectively reasonable under the Fourth Amendment, their actions cannot be willful and wanton as defined in the Illinois Tort Immunity Act. Accordingly, the officers are entitled to immunity on Mr. Kapernekas's state law claims. It follows that the Village cannot be vicariously liable for the state law claims under the theory of *respondeat superior* because Officers Numanaj and Kelley are not liable for any of the state law claims. *See* 745 ILCS 10/2–109 ("A local public entity is not liable for an injury resulting from an act or omission of its employee where the employee is not liable").

## **CONCLUSION**

For the foregoing reasons, defendants' motion for summary judgment is granted in its entirety (doc. # 40). We enter judgment for defendants and against plaintiff on all claims. This case is terminated.

ENTER:

**SIDNEY I. SCHENKIER**
**United States Magistrate Judge**

**DATE: April 9, 2019**